STATE v. ALLEN et al.

BURNETT v. SHORE et ux.—181 S. W. (2d), 375.

Western Section.   June 11, 1943.

Petition for Certiorari denied by Supreme Court, January 8, 1944.

Hudgins & Hudgins, of Union City, for Burnett.

David G. Caldwell, of Union City, for Shore and wife.

KETCHUM, J. These two causes were consolidated and heard together in the chancery court. In State v.

Allen two tracts of 120 and 60 acres of land, respectively, belonging to D. H. Burnett and his sister Mrs. L. M. Shore as tenants in common were sold to the State for several years' delinquent taxes. This sale was confirmed by the court on April 8, 1938, and on July 17, 1940, and August 20, 1940, respectively, the Commissioner of Finance and Taxation, with the consent and approval of the Governor and Attorney General, conveyed said tracts to L. M. Shore, the husband of the defendant Mrs. L. M. Shore, in consideration of the payment of the amounts for which said property was bid in by the State, together with the taxes for the years 1938 and 1939, plus all interest, penalties, costs, etc., as provided by section 1609 of the code; and the said L. M. Shore filed his petition in said cause praying for a writ of possession to put him in possession of said property.

The defendant D. H. Burnett thereupon filed his bill in the second of the above styled causes claiming the right to redeem his undivided 5/6 interest in said tracts upon the theory that the purchase of said tracts by the defendant L. M. Shore inured to the benefit of complainant and Mrs. L. M. Shore, who are brother and sister, and who prior to the sale to the State for taxes were the owners of said lands as tenants in common in the proportion of 5/6 in complainant and 1/6 in Mrs. Shore, and he tendered with his bill the sum of $372.95, which he alleged was his proportionate part of the amount paid by the defendant L. M. Shore for the purchase of said property, including interest, penalties and costs.

After the decision by the supreme court of the case of Valentine v. Fry et al., unreported, construing the Tax Moratorium Acts of March 3, 1939, chapter 50, Pub. Acts 1939, the complainant Burnett filed an amended bill in which he challenged the validity of the deeds from

the commissioner of Finance and Taxation upon the ground that they were made before the time for the redemption of said property had expired, and were unauthorized and void, and that the payment of the taxes, interest, penalties and costs by the defendant Shore before the time for the redemption of said property had expired operated only to redeem said property from the sale for the owners thereof.

The defenses made by the answers were that no confidential relationship existed between Shore and complainant; that Shore purchased said lands for his own benefit, and not for the benefit of his wife; and that the tender made was insufficient because he had paid $466.85 for said property, and that the tender of 5/6 of that amount was insufficient. And for answer to the amended bill the further defenses of laches and the statute of limitations of three years, Code, sec. 1610, were relied upon.

The chancellor denied the complainant Burnett the relief sought, dismissed his bill, and awarded the defendant Shore a writ of possession, and the complainant Burnett has appealed.

The chancellor based his decree upon the finding that Burnett and his sister Mrs. Shore had not been on good terms for a number of years; that no confidential relationship existed between them; that Shore had practiced no fraud upon Burnett in buying said property, and that he bought the property on his own account, and not for the benefit of his wife. He denied any relief under the amended bill upon the ground that the complainant's tender was not made until after the time for redemption had expired, and that his right to redeem was barred by the statute of limitations of three years.

The assignments of error challenge the correctness of his findings and the conclusions based thereon in respect to all of the above matters.

█ The defendants recognize the general rule laid down in Tisdale v. Tisdale, 34 Tenn., 596, 64 Am. Dec., 775, and followed in the recent case of Perkins v. Johnson, 178 Tenn., 498, 160 S. W. (2d), 400, 401, that "tenants in common 'cannot buy in the common property at a tax sale, or foreclosure sale, or buy in an outstanding title or other overhead claim, except for the benefit of all.' "

The reasons for this rule are so well stated by Mr. Justice Caruthers in Tisdale v. Tisdale, supra, that we quote them at some length:

"He (defendant) was jointly interested in the land with the complainants as tenant in common, by descent. As such, he will be regarded as acting for all in the removal of an incumbrance, or perfecting the title, unless the contrary is clearly made to appear. 1 White & Tudor Leading Cases, 56. Tenants in common by descent, are placed in a confidential relation to each other, by operation of law, as to the joint property, and the same duties are imposed as if a joint trust were created by contract between them, or the act of a third party. It may be different, where they claim title by distinct purchases, even of the same original title, but that is not the case before us. Being then interested with, and for each other, in the property, each one is prohibited from acquiring rights in it, antagonistic to the others. 1 White & Tudor, 53. Being associated in interest as tenants in common by descent, an implied obligation exists to sustain the common interest. This reciprocal obligation will be vindicated and enforced in a court of equity, as a trust. These relations of trust and confidence bind all

to put forth their best exertions, and to embrace every opportunity to protect and secure the common interest, and forbid the assumption of a hostile attitude by either; and therefore, the purchase by one of an outstanding title, or an incumbrance upon the joint estate, in his own name, will enure to the equal benefit of all, but they will be compelled to contribute their respective ratios of the consideration actually given.''

To the same effect, see also annotation in 54 A. L. R., page 895; 11 Am. Jur., ''Cotenancy,'' secs. 51, 54.

But the defendants contend, and the chancellor held, that the present case falls within the exception to the general rule because Burnett and Mr. and Mrs. Shore were not on friendly terms and no confidential relationship existed between them. This finding is based entirely upon the following testimony of Mrs. Shore:

''Q. Is there any confidential relationship between you and Squire Burnett? A. No.

''Q. You may state whether or not there is good feeling or bad feeling between you and Squire Burnett? A. Bad feeling.

''Q. How long has that feeling existed? A. About thirty years.

''Q. Did you and your husband ever go into any agreement to defraud Squire Burnett out of these two tracts of land? A. No.

''Q. Did you ever have any conversation with Squire Burnett about the taxes on these two tracts of land? A. I certainly did.

''Q. What did you say to him and what did he say to you? A. I walked to Troy and went in his room and said: 'Well, Dave, I have come down here to tell you our home place is going to be sold for taxes. Let's not let it sell.' He said: 'You get out of my house, and don't

come around me any more. You only come down here tending to my business and I don't want you about me.'

"Q. Where did you say that conversation took place? A. In his room. I went out to the car and he followed me out. He said: 'Don't you know I didn't pay the high school tax? And I said, 'Well, by that you think you are going to get out of paying these?' He said, 'Well, didn't I say what I did?'

"Q. At that time did you own 1/6 interest in these two tracts? A. I thought I was due 1/6 of it."

Squire Burnett admitted having had a conversation with Mrs. Shore about paying off the taxes on the two tracts on this occasion but emphatically denied that Mrs. Shore's statement of what was said was correct. He said that he took the position that Mrs. Shore should pay the delinquent taxes on the 60 acre tract because she had had possession of 47 acres of it while her share amounted to only 30 acres, but that she would not agree to that. He testified that so far as he was concerned there had never been any trouble or ill feeling between him and Mr. and Mrs. Shore, that he thought Mr. Shore "felt unkind" toward him, but that there had never been any ill feeling between him and his sister, and that he had never known of any such feeling on her part towards him until recently; that Mrs. Shore's son and daughter visited in his home frequently, "and I thought everything was all right as far as the family was concerned. If they had any hard feelings I don't know it."

He testified that the two tracts originally belonged to his father who died in 1900, and that after his father's death they were occupied by his mother until her death in 1927; that he bought the shares of four of his sisters, paying each of them the sum of $500 for her share; that Mrs. Shore's share was 30 acres, and that she

wanted the part next to her husband's land; that she wanted the line run at a certain place and that they had had a surveyor run the line where she wanted it, and that this gave her 47 acres and that it was agreed that she was to pay him for the extra 17 acres the same price that he had paid his other sisters for their undivided shares; that she had had possession of the 47 acres ever since but had not paid him for the excess of 17 acres above her share and for that reason he had never given her a deed.

Mrs. Burnett testified with reference to Mrs. Shore's visit to the Burnett home on that occasion, that she talked with Mrs. Shore for three-quarters of an hour and did not notice anything to indicate that there was any unpleasantness between Mrs. Shore and Mr. Burnett. She did not hear the conversation between them as she felt that Mrs. Shore wanted to talk to him privately, so she went to the back part of the house. Mrs. Shore was at the house for about an hour and a half. Mr. Burnett left before Mrs. Shore did, and Mrs. Shore's conversation with her occurred after he had left the house. She and Mrs. Shore left the Burnett house together and went to the church to attend Mrs. Ryan's funeral, sat together in the church, and Mrs. Shore was very nice to her. Mr. and Mrs. Burnett were married on January 3, 1938, and Mrs. Burnett said she had never heard of any unpleasantness between Squire Burnett and his sister.

Squire Burnett and Mrs. Shore also sold some timber from the two tracts about eight years ago, most of which came off the 133 acres occupied by him, and he paid Mrs. Shore 1/6 of the amount realized from the sale of this timber.

Mrs. Shore did not go on the witness stand to deny any of these matters that are testified to by Mr. and Mrs. Burnett, and in the light of these undisputed facts we are unable to concur in the chancellor's finding that such bad feeling had existed between Squire Burnett and Mrs. Shore for thirty years or more. We have quoted everything that she says occurred on the occasion of her visit to his home to talk to him about the taxes before the places were sold. Granting that the feeling between them may not have been as friendly and cordial as usually exists between brother and sister we cannot believe that he would have insulted her and ordered her out of his house and refused to talk with her about a matter of business in which they were jointly interested. Nor can we reconcile her testimony with the undisputed fact that she remained at his house for an hour and a half and went with Mrs. Burnett and her mother to the Ryan funeral, and sat with them in the church. We think Squire Burnett's recital of what was said in the conversation between them is much more reasonable, aside from the fact that he is corroborated not only by the testimony of his wife but by their previous dealings with each other with reference to the property.

It also appears that Squire Burnett sought earnestly to avoid the "notoriety of litigation" with his sister, because she was his sister and because they belonged to the same church, and he thought it was a "shame" for them to have a lawsuit; and in an effort to avoid litigation he sent their mutual friends Dr. Meek, Dr. and Mrs. Roberts, and his sister Mrs. Carmack, and his son and daughter to try to reach some sort of settlement with the Shores without litigation, but they all reported that Mrs. Shore declined to consider any offer of settlement.

█ We think the weight of the evidence is against the chancellor's finding with regard to the state of feeling between the parties and that he was in error in holding that the peculiar facts of this case brought it within the exception to the general rule that the purchase of the property by one cotenant at a tax sale inured to the benefit of all.

█ Nor do we think the fact that the property was purchased by the husband of Mrs. Shore instead of by Mrs. Shore herself is of any consequence. See 11 Am. Jur. "Cotenancy," sec. 51, page 121, where it is said that:

"This rule (that the purchase by one cotenant inures to the benefit of all) is said to be inflexible without regard to the consideration paid, or the honesty of intent, for the reason that public policy requires it, not only as a shield to the parties represented but as a guard against temptation on the part of representatives. To illustrate the strictness of its operation the purchase of an outstanding interest by the husband of a cotenant has been held to inure to the benefit of all."

Numerous cases are cited to sustain this text.

In Rothwell v. Dewees, 2 Black, 613, 17 L. Ed., 309, the supreme court of the United States applied the rule to the case of a purchase of an outstanding title by the husband of one of the tenants in common. And see other cases cited in note at page 879 of 54 A. L. R.

██ Nor is there any merit in the contention that the complainant Burnett cannot maintain his suit because it was not brought within three years after the date of sale. It is true that section 1610 of the Code provides that no suit to invalidate a tax title to land can be maintained after three years from the time of sale. But, as pointed out in Perkins v. Johnson, supra, this section has

no application here because it is not sought by the bill to invalidate the tax sale; and, besides this, the bill was filed within three years from the confirmation of the sale. The sale for taxes was confirmed on April 8, 1938, and the bill was filed on April 7, 1941. The sale was not completed until it was confirmed by the court on April 8, 1938. Tennessee Marble & Brick Company v. Young, 179 Tenn., 116, 163 S. W. (2d), 71, 74; Bryant v. McCollum, 51 Tenn., 511, 517; In re Tax Title cases, 105 Tenn., 243, 250, 58 S. W., 259.

█ It was not necessary for complainant to tender with his bill the entire amount of the purchase price paid by Shore, with interest, penalties, costs, etc., but only his proportionate part thereof. The rule is that:

"A cotenant desirous of participating in the benefits of an outstanding title acquired by an associate must within a reasonable time offer to contribute his due proportion of the cost thereof." 14 Am. Jur., 127, sec. 58. Tisdale v. Tisdale, supra.

█ The appellant seasonably offered to pay his pro rata part of the amount paid for the redemption of said property and his offers were refused. He tendered with his bill the sum of $372.95. This was slightly less than complainant's proportionate part of the amount necessary to redeem, but when this fact appeared from the proof he increased his tender to $390, which was slightly more than his proportionate share. This was sufficient, as an offer to contribute seems to be all that is necessary. 14 Am. Jur., 121, sec. 51, supra; and Tisdale v. Tisdale, supra.

For the reasons stated the decree of the chancellor will be reversed and a decree will be entered here in accordance with the views herein expressed. The cause

will be remanded for a distribution of the fund in the hands of the clerk and for such further proceedings as may be necessary. The costs will be adjudged against Mrs. Shore and will be retained out of the funds in the hands of the clerk and master.

Anderson, P. J., and Baptist, J., concur.