# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 17, 2019 Session

## J. PHILIP HARBER v. MARGUERITA ANNETTE DIXON, ET AL.

**Appeal from the Chancery Court for Anderson County**
**No. 14CH6451     M. Nichole Cantrell, Chancellor**

_____

### No. E2019-00028-COA-R3-CV

_____

This appeal arises from an acrimonious dispute between former friends over real property. William M. Pruitt and his wife Shirley J. Pruitt ("the Pruitts," or "Mr. Pruitt" and "Mrs. Pruitt") live in a house next to three parcels of land once owned variously by Mr. Pruitt's stepfather and mother, both of whom died intestate. J. Philip Harber ("Mr. Harber"), former attorney for the Pruitts, paid Mr. Pruitt's fellow heirs for quitclaim deeds with the aim of acquiring their interests in the subject parcels. Mr. Harber then filed a petition in the Chancery Court for Anderson County ("the Trial Court") to determine the interests of the parties and sell the three parcels. The Trial Court found in favor of Mr. Harber and ordered a partition by sale for division. The Pruitts appealed to this Court. On appeal, the Pruitts rely on several theories to argue that Mr. Harber never acquired an interest in the land. The Pruitts argue further that, even if Mr. Harber acquired an interest, the Trial Court should have applied the doctrine of unclean hands to deny him his requested relief because he sued them out of spite. We find and hold, *inter alia*, that Mr. Pruitt is but one of many heirs to his deceased parents' land; that the other heirs never lost their interests in the land; and, that the other heirs were at liberty to sell their interests in the land to Mr. Harber, which they did. Although there is considerable evidence that Mr. Harber was motivated by spite in bringing this action, that alone does not compel application of the unclean hands doctrine, particularly as fraud is not alleged. Finding no reversible error, we affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. Michael Swiney, C.J., delivered the opinion of the court, in which John W. McClarty and Thomas R. Frierson, II, JJ., joined.

Gerald L. Gulley, Knoxville, Tennessee, for the appellant, William M. Pruitt.

Philip R. Crye, Jr., Clinton, Tennessee, for the appellant, Shirley J. Pruitt.

Mark N. Foster, Madisonville, Kentucky, for the appellants.

J. Philip Harber, pro se appellee.

**OPINION**

**Background**

Mr. Harber and the Pruitts, formerly friends for many years, are neighbors with a long and tangled history. Mr. Pruitt is a mechanic and tow truck driver. Mr. Harber, a lawyer and businessman, represented the Pruitts in various legal matters over the years. The parties' friendship collapsed in 2007. In the feud that followed, three parcels of land historically belonging to Mr. Pruitt's family came to the forefront. While the Pruitts contend that they own the subject parcels solely, the controversy over who else may have an interest in the land—and thus a right to sell that interest—is at the center of this appeal. A review of the parcels is necessary.

The Pruitts live in Clinton, Tennessee. The properties at issue are parcels 24, 26, and 36. The Pruitts' home is located on parcel 24.01, a small lot that once was a part of parcel 24. Parcel 36 was owned solely by J.R. Harris, Mr. Pruitt's stepfather. Parcels 24 and 26 were owned by both J.R. Harris and his wife Juanita Harris, Mr. Pruitt's mother. J.R. Harris died in 1992, and Juanita Harris in 2003. Both died intestate. The last recorded deeds for the parcels are as follows: (1) Parcel 26: a quitclaim deed dated September 11, 1980 from Baby Boy Harris to J.R. and Juanita Harris; (2) Parcel 24: a quitclaim deed dated December 15, 1982 from Joe E. Magill and Elizabeth Ann Magill to J.R. and Juanita Harris; and, (3) Parcel 36: a warranty deed dated July 27, 1960 from John and Laura Young to J.R. Harris. Parcel 24.01 was conveyed to the Pruitts from J.R. and Juanita Harris by warranty deed dated November 11, 1983. Mr. Pruitt purportedly purchased parcel 24 for $3,000 in 1983. In 1999, Mr. Pruitt borrowed $61,200 secured by his home on parcel 24.01 and used some of the money, again purportedly, to pay his mother $10,000 apiece for parcels 36 and 26. No deeds were exchanged in these transactions, however. Parcel 26 was the site of an old house once occupied by J.R. and Juanita Harris. The Pruitts used parcel 36 as a garden. In 1984, Mr. Pruitt moved his mother to his house on parcel 24.01. The old house on parcel 26 remained standing but empty for 15 years until Mr. Pruitt demolished it in 1999.

Upon J.R. Harris's death in 1992, title to parcel 36 vested in his heirs, including Juanita Harris but also his four children, Donna Leigh Harris Sanders, John Robert Harris, Beulah Harris Pannell, and Eugene Rod Harris. Title to parcels 24 and 26 vested

solely in Juanita Harris as surviving tenant by the entirety. Juanita Harris had nine children, six of whom were living at the time of the proceedings below. In addition to Mr. Pruitt himself, these living children of Juanita Harris included Mary Ann Pruitt, Babe Ruth Pruitt, Donna Lee Harris Sanders, John Robert Harris, and Beulah Harris Pannell. Three of Juanita Harris's children are deceased. They are Charles William Washington, who died before his mother; Bobby Washington, who died before his mother; and, Eugene Rod Harris, who died after his mother. Charles William Washington had the following children: (1) Rodney Lee Washington, (2) Joseph Franklin Washington, (3) Charlotte Denise Washington, (4) Charles William Washington, Jr., (5) Anna Marie Bunn, (6) Robert Anthony Washington, (7) Samantha Jo Washington, and (8) Charles Adrian Washington. Bobby Washington had the following six children: (1) Marguerita Annette Dixon, (2) Bobbie Yvonne Washington Rowe, (3) Shenea Washington, (4) Gail Washington, (5) Kristie Leavette Washington, and (6) Mable Jeanette Washington Moore. Gail Washington is deceased. Eugene Rod Harris was married to Patty Harris when he died. Eugene Rod Harris had one child, Patrick Harris.

In the early years of the 21st century, the Pruitts were experiencing tax problems. In 2004, parcels 24, 26, and 36 were sold because of delinquent taxes. Mr. Pruitt later paid to redeem the parcels. The order of redemption for parcel 36 stated: "the property shall be considered redeemed by William M. Pruitt, heir to J.R. Harris, and title is thereby restored to him as of the date of this order [November 8, 2005]." In turn, the order of redemption for parcel 24 stated: "The property shall be considered redeemed by J.R. Harris and Juanita Harris, and title is thereby restored to them as of the date of this order [November 1, 2005]." Finally, the order of redemption for parcel 26 stated: "the property shall be considered redeemed by J.R. Harris and Juanita Harris, and title is thereby restored to them as of the date of this order [November 1, 2005]." At one point, the Pruitts' home was foreclosed on. In 2006, Mr. Pruitt consulted with his then-friend and attorney, Mr. Harber, regarding parcels 24, 26 and 36. When they were temporarily evicted from their home on parcel 24.01, the Pruitts built a small house on parcel 26 to live in. Mr. Pruitt later repurchased his property, parcel 24.01, and moved back home.

In 2007, Mr. Harber's friendship with the Pruitts fell apart completely. While the incident causing the split was not explored in depth at trial, as the Trial Court deemed it irrelevant, it involved Mr. Harber's dog getting killed. Mr. Harber blamed Mr. Pruitt. The next day, Mr. Harber left Mr. Pruitt a package containing his case files with a note stating: "Bill: I will NOT represent you again—EVER. Don't come on my property or call me again—EVER! You're on your own." Tensions continued to escalate as time passed. Mr. Harber allegedly made some defamatory statements about Mr. Pruitt's business practices. In 2012, Mr. Pruitt filed a civil warrant for defamation against Mr. Harber in general sessions court. In January 2013, the defamation case was dismissed, and no appeal was taken.

After the defamation case, the feud escalated further still. Beginning in February 2013, Mr. Harber obtained 14 quitclaim deeds from people he believed were members of Mr. Pruitt's family and heirs of Juanita Harris. The deeds describe parcels 24, 26, and 36. Mr. Harber paid cash to each signer. Mr. Harber traveled around as far as southwest Virginia to obtain these quitclaim deeds. In June 2014, Mr. Harber filed a petition in the Trial Court against the Pruitts, and anyone else he believed had an interest in the land, seeking the appointment of a special master to determine the respective interests of the parties in the three parcels and to sell the parcels. Mr. Pruitt filed an answer asserting that Mr. Harber failed to acquire an interest in the land through the quitclaim deeds. Mr. Pruitt also raised the affirmative defense of unclean hands. Mrs. Pruitt filed her own separate answer, as well as a counterclaim. Mrs. Pruitt relied upon the statute of limitations found at Tenn. Code Ann. § 28-2-101, *et seq.* to contend that the quitclaim deeds were champertous and void pursuant to Tenn. Code Ann. § 66-4-201, *et seq.* In her counterclaim, Mrs. Pruitt asserted that the quitclaim deeds were void and should be stricken on grounds of adverse possession and ouster.

The matter was bifurcated. First, in November 2016, a hearing was held on the Pruitts' affirmative defense of unclean hands. Mr. Harber testified that he undertook his quest for the quitclaim deeds because he wanted to prevent development on a vacant lot near his home. The Pruitts pressed Mr. Harber further on his motivations in filing the lawsuit. Mr. Harber was asked why, in February 2013, he posted copies of the deeds on Mrs. Pruitt's Facebook page and wrote: "What are these? Are you moving?" Mr. Harber testified:

Q. Why did you write in the Facebook message to Shirley Pruitt; are you moving?
A. Because I just did. I just did. I don't have a reason.
Q. That is your honest answer sitting here that you had no reason, your fingers just tripped over those letters on the keyboard?
A. That is your characterization.
Q. I mean, the answer is you have no excusable reason for having done it but you were angry, is that right?
A. Sure, I was angry at them.

A number of Mr. Pruitt's family members testified to the interactions they had with Mr. Harber. Mr. Harber had approached them and offered them money for quitclaim deeds, which they signed. The thrust of the relatives' testimony, at this hearing and subsequent ones, was that they did not know or believe they had any interest in the subject parcels. They just went along with the transaction.

-4-

Mr. Pruitt also was a witness, and he testified as to his 2006 discussions with Mr. Harber regarding the subject parcels:

Q. But during your discussion with Mr. Harber, what did he say about your brothers and sisters' interest in the property?
A. That's when he was telling me about the legal claim and claim. He said, they can claim it but they got to have a legal claim which they do not have. He said, did they offer to pay you your money back. I said, no. He said, did you make them aware. I said, yes, I called my sister and I told her, I said, look, we lost our property, I said, even though I lost it as well. If you all want to claim interest in it, you all can reimburse me my money and we can all have a legal claim in it again.
Q. That money you paid after the tax sale; was that your money or everybody's money?
A. My money.

The Trial Court ruled in favor of Mr. Harber and declined to apply the unclean hands doctrine. In its November 2016 order, the Trial Court stated, in part:

The Court notes that no one is alleging that Petitioner's transactions with other heirs were fraudulent in nature. Many of the persons testifying at the hearing in this matter where those who had participated in the transactions for the purchase of their interest in the real property by Mr. Harber. None of these heirs have stepped forward to declare that these transactions needed to be set aside because they were fraudulent in nature. The Court concludes that there has been no proof offered to show that Petitioner committed any fraud or wrongdoing in the present litigation before the Court related to the transactions by which he obtained in lots #24, #26 and #36.

***

The Court concludes that the Respondents are not entitled to the application of doctrine of unclean hands as an affirmative defense in the action. The Court finds that there has been no fraudulent action or misconduct on the part of the Petitioner that rises to the level to warrant the application of the maxim of unclean hands. The anger that exists between the parties is simply not sufficient proof of unclean hands. Any other alleged misconduct by the Petitioner is not related to the cause of action that is currently before the court. The Court also concludes there has been no proof of damages by the Respondents. Therefore, the Court concludes

that the Respondents are not entitled to relief based on their defense of unclean hands.

The next phase of trial was conducted in July of 2017 and it concerned the Pruitts' theories of title by prescription, adverse possession based on color of title for at least seven years, common law adverse possession of twenty years, and champerty. Mr. Pruitt took the stand and testified that his relatives knew the land was his. In 1999, he discussed the issue with his sisters Mary Ann and Donna and his brother Rod. Mr. Pruitt stated that he had paid the taxes on the subject parcels since 1992. Mr. Pruitt testified that around the time he faced foreclosure, he consulted with Mr. Harber about ownership of the property, especially parcel 26. According to Mr. Pruitt, Mr. Harber asked him if any family members had helped pay taxes on the parcels. Mr. Pruitt told Mr. Harber they had not. Mr. Pruitt testified that Mr. Harber then stated: "well, technically it's yours." When Mr. Harber came to the stand, he testified: "I never discussed the title of—[Mr. Pruitt's] chain of title to his property. I never looked at the title to any of these properties until 2013—or late 2012, I guess." After overruling a motion by the Pruitts for a directed verdict, the Trial Court ruled that because evidence of a previously unknown heir had emerged and the Guardian ad Litem was not present, the hearing would have to be continued to a later date.

In April 2018, the hearing resumed. Mrs. Pruitt took the stand. Mrs. Pruitt, age 59, testified that she had lived at her home near the disputed land with her husband for approximately 40 years. Since Juanita Harris died, no one else lived there other than the Pruitts and their children and grandchildren. Mrs. Pruitt testified that in the 40 years she has lived there, no family member has ever challenged her or her husband's right to the property. Mrs. Pruitt stated that neither she nor her husband ever sought permission from any family member to build anything on the subject parcels.

Another potential heir, Quenelle T. Frazier ("Mr. Frazier"), testified. Mr. Frazier, age 29, was unsure exactly how he was related to Mr. Pruitt, but he had been served with an amended petition. Mr. Harber had asked him to sign a quitclaim deed but he refused to do so. Mr. Frazier did not claim any of the land, which he had last seen when he was much younger.

Mr. Pruitt testified. Mr. Pruitt stated that he had lived on the property since 1958. In 2005, Mr. Pruitt learned that the subject parcels had been sold at a tax sale because of delinquent taxes. Mr. Pruitt paid to redeem the parcels. On cross-examination, Mr. Pruitt was asked about the level of contact he had with his family over the years, and whether he had held out that he owned the land exclusively:

Q. Do you recall saying in your deposition that you-all lost it? Not "you" lost the property; "you-all" lost the property? You told Mary Ann, "Look here, we all lost the property. If you want to claim an interest in it, I'm trying to get it back."

A. Well, let me clarify that. Based on the way it was sold in my mother and them's name, yes, that would show there. But in reality I owned it. I just didn't get it taken out of my parents' name.

Q. Okay. Did you have a written contract with your parents to purchase this property?

A. A written contract?

Q. Written contract?

A. Why should I?

Q. Well, did you or didn't you?

A. No. I put my house up for collateral to get the old house dozed down in '99 and made a loan for $61,000. And what -- the agreement was between me and my mother.

Q. Okay. But you didn't have a written contract?

A. Like I said, I didn't need one.

Q. Okay.

A. We only had a verbal contract.

Q. Did you ever record a deed?

A. The $61,000 deed, yes, trust deed.

Q. That's a trust deed. Did you ever record a warranty deed, a deed of ownership? You just -- all you have is a trust deed to show?

A. I paid the money, didn't I?

Q. I don't know if you did or not.

A. Okay, then.

***

Q. Do you recall taking the deposition back in December across the street --

A. Yes, I do.

Q. -- at Mr. Pruitt's [sic] office, and I asked you questions?

A. Yes, sir.

Q. Okay. I'll start at Page 22, Line 5. I asked you "How often do you see your family?" You answered "Not often."

A. That's correct; I did.

Q. Okay. And then I went through several of the people and asked you when you had seen them. I asked you when the last time you'd seen Ronnie Lee Washington, and you said it'd been years; is that correct?

A. That's correct.

Q. Okay. I asked you -- do you recall me asking about Charlotte Denise Washington?
A. Yes, I do.
Q. And I asked you if you had seen or talked to her since your mother -- you said no. And then you said -- I asked you since your mother's death. You said about two times. I asked you if you discussed the lawsuit with her. You said no, and I asked if you discussed the property with her, and you said when you first got the deed. Do you recall that?
A. Yes, I do.
Q. In fact, most of these people had said you didn't discuss any of these -- this property with them until the deed, until I -- until I had a deed, and then you started making contact to them; is that correct?
A. That's correct.
Q. Or maybe some of them contacted you.
A. They contacted me.
Q. You started having contact with them.
MR. HARBER: That's all I want to ask him, your Honor.

After this second round of hearings, the Trial Court again ruled in favor of Mr. Harber. The Trial Court rejected each of the Pruitts' theories as to their sole ownership of the subject parcels. In its May 2018 order, the Trial Court stated, in part:

[Adverse Possession]

Shirley Pruitt claims that she has had possession for a period of twenty years. However from January 1, 2003 until this suit was brought on June 20, 2014 does not amount to the necessary period of 20 years and therefore the Respondent Shirley Pruitt has failed to prove by clear and convincing evidence a twenty year period of adverse possession.

***

By the testimony of William Pruitt it is clear to this court that there was little contact between the Pruitt's and the other cotenants such that the court concludes that there was never notice to the other cotenants sufficient to establish an ouster of the other cotenants. There was no notice given to the other cotenants that they were excluded from possession.
Several other heirs testified at trial that they did not believe they had any interest in the property and that the property in their opinion belonged

to William and Shirley Pruitt, this is not demonstrative of an actual ouster. Ignorance and or lack of notice of one's right of entry and possession for the three lots does not amount to an ouster. Specifically, there was testimony that neither William nor Shirley Pruitt ever told them "to get off their land." The testimony of those other heirs was that it was their belief that the property belonged to William and Shirley Pruitt, is more in line with permissive use and not actual ouster between cotenants. This also brings the adverse nature of the Pruitt's possession into question if some of the other cotenants in common had given their implied permission for the Pruitts to use the three lots.

For these reasons this court concludes that the Respondent, Shirley Pruitt has failed to meet her burden of proof by clear and convincing evidence that there has been adverse possession by William and Shirley Pruitt under the common law theory of uninterrupted and continuous possession of the land for twenty years and that the possession was (1) actual and exclusive (2) open, visible and notorious (3) continuous and peaceable (4) hostile and adverse.

***

[Color of Title, Seven Years]

The court has considered all the documents which were brought forth during trial which might create color of title. The court would also note again that Mr. Pruitt continues to state that he owned all of lot 24, alleging he purchased it from his mother, Juanita Harris in 1999. However there is no deed or any other writing transferring lot 24 to Mr. William Pruitt or Shirley Pruitt. Therefore this alleged purchase does not qualify as color of title.

The Pruitts point to the November 11th, 1983 [deed] which transferred lot 24.01 to William M. Pruitt and Shirley Pruitt from J.R. Harris and wife Juanita Harris to show color of title. (Exhibit 3) This deed transferred a small section of lot 24 to the Pruitts but retained the remainder of lot 24 in the name of J.R. Harris and wife Juanita Harris. The Pruitts argue that the clause in the deed which reads "This being the same property conveyed to J.R. Harris and wife, Juanita Harris from Joe E. McGill and Elizabeth Ann Magill, his wife by deed date December 15, 1982, of record in Deed Book X page 15, 334, in the Register's Office for Anderson County, Tennessee" creates color of title. This court rejects that argument as the description of the property given in the deed makes it absolutely

clear that this is not a conveyance of the entire Lot 24, but instead a small portion of Lot 24 which became lot 24.01.

The Pruitts also point to a series of Trust deeds that they execute to secure a loan as proof of color of title. All of the trust deeds refer to lot 24.01, and therefore cannot be said to create color of title for any other lot. The only deed that contained an error was the Special Limited Warranty Deed executed by Econohomes, LLC to William Pruitt registered on 3/24/2008 which listed lot 24 in the deed; however a corrective deed was registered on 12/08/2008 correcting the lot number to reflect lot 24.01. Therefore any color of title the Pruitts may have claimed under this Warranty Deed could no longer be claimed once the correction deed was issued and registered. (Exhibits 7 and 20) Therefore this court concludes that these deeds do not create color of title upon which the Pruitts may assert a defense or a claim of title by adverse possession.

Finally [the] Pruitts assert that color of title was created when Mr. William Pruitt redeemed the three lots following a delinquent tax sale of all the lots in question as proof of color of title. As discussed in detail above all three lots were sold at a delinquent tax sale in 2004. The order confirming sale was entered on October 25th, 2004 confirming the sale of Lots 24, 26 and 36. (Exhibit 15) The order confirming the sale amounted to a break in any claim of adverse possession by color of title prior to that date. After the sale the only right that belonged to the cotenants in common was the right of redemption.

***

Finding No document that creates color of title, this court concludes the Respondent Shirley Pruitt has failed to meet her burden of clear and convincing evidence and that there is no basis for title to be conveyed to William and Shirley Pruitt pursuant to T.C.A. §28-2-105. In addition this court concludes that the Respond[ent] Shirley Pruitt has fail[ed] to meet her burden of clear and convincing evidence to assert the affirmative defense of adverse possession under T.C.A. §28-2-102 and §28-2-103.

***

[Title by Prescription]

This court finds that the Pruitts claim of title by prescription fails because there is no twenty year period of time that the Pruitts can claim exclusive and uninterrupted possession. As was discussed above, the

-10-

earliest time in which the Respondent Shirley Pruitt could begin to claim possession of the property in question was upon the death of Juanita Pruitt on January 1, 2003. Juanita Harris continued to reside at 531 Broad Street, the street address of the property in question, until her death and therefore retained her possessory rights until her death. Juanita Pruitt lived on the property with her son and daughter and there is no proof offered that William Pruitt and Shirley Pruitt did not have permission of Juanita Pruitt to reside on the property with her until her death. William Pruitt and Shirley Pruitt cannot claim that their possession of the land at any time prior to the death of Juanita Pruitt on January 1, 2003 was exclusive as Juanita Harris was in possession of the property.

\*\*\*

Secondly, the Pruitts have failed to show that none of the cotenants were not under a disability to asse[r]t their rights to the property during this time frame. Disability in this case can include the disability of minority during the requisite twenty year period of time. One of the cotenants that testified on the second day of trial was Quenelle T. Frazier. His testimony was brief but included his statement that he was 29 years old. That in and of itself is sufficient to show that at least one of the tenants in common had the disability of minority during some portion of the requisite twenty years period of time.

Thus this court concludes that the respondents, William and Shirley Pruitt have failed to prove two of the essential elements of title by prescription.

\*\*\*

[Champerty]

By the testimony of William Pruitt it is clear to this court that there was little contact between the Pruitt's and the other cotenants such that the court concludes that there was never notice to the other cotenants sufficient to establish an ouster of the other cotenants. There was no notice given to the other cotenants that they were excluded from possession. Several other several heirs testified at trial that they did not believe they had any interest in the property and that the property in their opinion belonged to William and Shirley Pruitt. This is not demonstrative of an actual ouster. Ignorance and or lack of notice of one's right of entry and possession for the three lots does not amount to an ouster. The testimony of those other heirs was that it

was their belief that the property belonged to William and Shirley Pruitt, is more in line with permissive use and not actual ouster between cotenants. This also brings the adverse nature of the Pruitt's possession into question if some of the other cotenants in common had given their implied permission for the Pruitts to use the three lots.

Therefore this court concludes that the deeds conveying interest in the real property to Phillip Harber are not void due to the Champertous statutes as the Pruitt's possession of the property at the time of the deeds was not adverse to the other tenants in common by descent as there was no action taken that can amount to an ouster of the other cotenants.

\*\*\*

The land cannot feasibly be partitioned in kind and therefore, the property must be partitioned by sale.

As a final matter below, the Trial Court found it necessary to determine whether additional proof was necessary regarding certain other heirs. In December 2018, the Trial Court entered its final order, stating as relevant: "The prior order entered on May 8, 2018 shall be amended to provide[] that those parts of the order indicating that additional proof was necessary regarding the interests of Rod Harris and Charles Washington are deleted, there being, in the opinion of the Court, sufficient evidence previously in the record regarding the succession of their interests in the property." The Pruitts timely appealed to this Court.

## Discussion

We restate the issues the Pruitts raise on appeal as follows: 1) whether the Trial Court erred by denying the Pruitts' claim of title by prescription; 2) whether the Trial Court erred by denying the Pruitts' claim of adverse possession based on color of title for at least seven years; 3) whether the Trial Court erred by denying the Pruitts' claim of common law adverse possession; 4) whether the Trial Court erred by denying the Pruitts' claim of champerty; and, 5) whether the Trial Court erred by denying the Pruitts' claim of unclean hands.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred by denying the Pruitts' claim of title by prescription. The Pruitts raise this issue with respect to parcel 36 only. In their appellate brief, the Pruitts summarize their argument on this issue:

(a) first, the prescriptive period did not begin on the death of Juanita Harris on January 1, 2003, as found by the Chancellor, but rather on January 16, 1992, when J.R. Harris died; and
(b) second, even if Quenelle T. Frazier held an interest in the property and was under the disability of minority during the prescriptive period—a fact not established by the record—then his disability does not strengthen the plaintiff's title for the simple reason that Mr. Frazier never signed a quitclaim deed.

Our Supreme Court has identified the three elements to title by prescription as follows:

(a) The prescriptive holder must have been in exclusive and uninterrupted possession of the land for a period of twenty years or more, claiming the land as his own without any accounting to his cotenants[;]
(b) The prescriptive holder's cotenants must have been under no disability to assert their rights during the prescriptive period of twenty years[; and]
(c) The prescriptive holder's occupancy must have been without the permission, actual or implied, of the other cotenants.

*Roberts v. Bailey*, 470 S.W.3d 32, 39 (Tenn. 2015) (quoting *England v. England*, No. E2011-02094-COA-R3-CV, 2012 WL 4503434, at *5-6 (Tenn. Ct. App. Oct. 2, 2012), *Rule 11 appl. perm. appeal denied Feb. 13, 2013*). Unlike the doctrine of adverse possession, title by prescription does not require the actual ouster of cotenants. *Id*. at 41. As to what constitutes ouster, "[a]n ouster does not necessarily mean a physical expulsion of one party by another, but it requires the party claiming adversely to perform some act that makes it clear to his cotenant that she is being excluded from ownership." *Nesmith v. Alsup*, No. 01-A-01-9809-CH00509, 1999 WL 557620, at *4 (Tenn. Ct. App. Aug. 2, 1999), *no appl. perm. appeal filed*.

The Pruitts argue that when J.R. Harris died in 1992, the prescriptive period began to run as to parcel 36 against the other heirs of J.R. Harris. Mr. Harber acquired the quitclaim deeds in 2013, more than twenty years after Juanita Harris and the Pruitts began their exclusive possession. The Pruitts assert that Juanita Harris's exclusive possession may be tacked on to that of the Pruitts, which began with Juanita Harris's death in 2003, to reach the necessary twenty years. Successive possessory periods may indeed be tacked on for purposes of title by prescription. *Roberts*, 470 S.W.3d at 40

-13-

(agreeing with the Court of Appeals' conclusion that the parents' possession of the subject tract could be tacked onto their children's subsequent possession). Nevertheless, it is unclear that Juanita Harris's possession ever was "exclusive." There is no evidence that she excluded, or failed to account to, any other cotenant.

Even if we accept the Pruitts' contention that the prescriptive period began in 1992, the third element of title by prescription, although not addressed by the Trial Court, requires that the prescriptive holder's occupancy be without the actual or implied permission of the cotenants. The Pruitts state that "[Mr. Harber] presented no proof of permission or open indulgence of Mr. and Mrs. Pruitts' possession in rebuttal to the presumption." However, The Trial Court found in its May 2018 order that "there is no proof offered that William Pruitt and Shirley Pruitt did not have permission of Juanita Pruitt to reside on the property with her until her death." The Trial Court found elsewhere in its order that "[t]he testimony of those other heirs was that it was their belief that the property belonged to William and Shirley Pruitt, is more in line with permissive use. . . ." We agree with the Trial Court's characterization of the Pruitts' occupancy of the disputed property. That the Pruitts once tended a garden on parcel 36 is not inconsistent with their cotenancy with the other heirs.

Regarding disability of other cotenants, the Trial Court found that Mr. Frazier, the 29-year old named in the amended petition as an heir of Juanita Harris via the deceased Gail Washington, was of minority age during the prescriptive period. The Trial Court correctly found that Mr. Frazier's being 29 at the 2018 hearing "in and of itself is sufficient to show that at least one of the tenants in common had the disability of minority during some portion of the requisite twenty years period of time." The Pruitts argue that Mr. Frazier's alleged disability is irrelevant because he never signed a quitclaim deed. However, the prescriptive period could not run while Mr. Frazier remained legally incompetent to assert his interest whether Mr. Harber ever obtained a quitclaim deed from Mr. Frazier or not. Thus, Mr. Frazier's age was relevant to an essential element of the Pruitts' claim. We affirm the Trial Court's conclusion that the Pruitts failed to establish title by prescription to parcel 36.

We next address whether the Trial Court erred by denying the Pruitts' claim of adverse possession based on color of title for at least seven years. As with the previous issue, the Pruitts make this argument with respect to parcel 36 only. The Pruitts contend that the governing seven year statute of limitations found at Tenn. Code Ann. §§ 28-2-101 and 102 "began to run when the order of redemption [as to parcel 36] was recorded on December 8, 2005 and extinguished the interests of the other heirs of Juanita Harris in parcel 36 seven years later, before the quitclaim deeds were signed in February 2013." Color of title has been defined as "'something in writing which at face value, professes to pass title but which does not do it, either for want of title in the person making it or from

the defective mode of the conveyance that is used.'" *Cumulus Broadcasting, Inc. v. Shim*, 226 S.W.3d 366, 376 n. 3 (Tenn. 2007) (quoting 10 *Thompson on Real Property* § 87.12, at 145).

This issue requires us to consider the effect a cotenant's redemption of property sold at a tax sale has on other cotenants. As discussed by this Court:

> In holding that the Clerk & Master was not authorized to give the plaintiff a deed conveying a *fee simple* title, we rely, in part, upon a doctrine that appears to have been first pronounced by the Supreme Court in the case of *Tisdale v. Tisdale*, 34 Tenn. 596, 599 (1855). That doctrine was described in a later case as providing that tenants in common "cannot buy in the common property at a tax sale, or foreclosure sale, or buy in an outstanding title or other overhead claim, except for the benefit of all." *State v. Allen*, 27 Tenn. App. 357, 181 S.W.2d 375, 376 (1944) (quoting *Perkins v. Johnson*, 178 Tenn. 498, 160 S.W.2d 400, 401 (1942)). It logically follows from the *Tisdale* doctrine that a joint tenant who redeems property is doing so "for the benefit of all." *Allen*, 181 S.W.2d at 376. The plaintiff's act of redemption was correctly regarded by the trial court and the Clerk & Master as an act for all. The doctrine of *Tisdale v. Tisdale* has long been cited with approval in this state:
>
> > Tenants in common by descent, are placed in a confidential relation to each other, by operation of law, as to the joint property, and the same duties are imposed as if a joint trust were created by contract between them, or the act of a third party. . . . Being then interested with, and for each other, in the property, each one is prohibited from acquiring rights in it, antagonistic to the others. Being associated in interest as tenants in common by descent, an implied obligation exists to sustain the common interest. This reciprocal obligation will be vindicated and enforced in a court of equity, as a trust. These relations of trust and confidence bind all to put forth their best exertions, and to embrace every opportunity to protect and secure the common interest, and forbid the assumption of a hostile attitude by either; and therefore, the purchase by one of an outstanding title, or an incumbrance upon the joint estate, in his own name, will enure to the equal benefit of all, but they will be compelled to contribute their respective ratios of the consideration actually given.

*Allen*, 181 S.W.2d at 377 (quoting *Tisdale*, 34 Tenn. at 599) (citations omitted). From a legal standpoint, the acts of the plaintiff in this case were clearly for the benefit of all of the owners of the property.

*Jones v. Anderson*, 250 S.W.3d 894, 898 (Tenn. Ct. App. 2007).

When Mr. Pruitt redeemed parcel 36, he did so for the benefit of all of the cotenants, not just himself. We, as did the Trial Court, find nothing in the record to support Mr. Pruitt's contention that his paying to redeem parcel 36 coincided with an ouster of his fellow heirs and cotenants. The language of the redemption order reflects the fact that Mr. Pruitt was acting in his capacity as an heir rather than buying the property for himself. We find no evidence that the Pruitts ousted their cotenants at any point, by word or deed. Rather, the Pruitts simply went on living on the property as they had done before. We affirm the Trial Court in its declining to find adverse possession based on color of title for at least seven years.

We next address whether the Trial Court erred by denying the Pruitts' claim of common law adverse possession. This argument is made with respect to parcels 24 and 26. Our Supreme Court has explained common law adverse possession as follows:

> In our state, common law adverse possession rests upon the proposition "that, where one has remained in uninterrupted and continuous possession of land for 20 years, a grant or deed will be presumed." *Ferguson v. Prince*, 136 Tenn. 543, 190 S.W. 548, 552 (Tenn. 1916); *see also Webb v. Harris*, 44 Tenn. App. 492, 315 S.W.2d 274, 277 (Tenn. Ct. App. 1958). Color (or assurance) of title is not required. *Keel v. Sutton*, 142 Tenn. 341, 219 S.W. 351, 352-53 (Tenn. 1920); *Hallmark v. Tidwell*, 849 S.W.2d 787, 792-93 (Tenn. Ct. App. 1992). In order to establish adverse possession under this theory, or in any statutorily based claim, the possession must have been exclusive, actual, adverse, continuous, open, and notorious for the requisite period of time. *Hightower v. Pendergrass*, 662 S.W.2d 932, 935 n. 2 (Tenn. 1983); *cf. Menefee v. Davidson County*, 195 Tenn. 547, 260 S.W.2d 283, 285 (Tenn. 1953). Adverse possession is, of course, a question of fact. *Wilson v. Price*, 195 S.W.3d 661, 666 (Tenn. Ct. App. 2005). The burden of proof is on the individual claiming ownership by adverse possession and the quality of the evidence must be clear and convincing. *O'Brien v. Waggoner*, 20 Tenn. App. 145, 96 S.W.2d 170, 176 (Tenn. Ct. App. 1936). The actual owner must either have knowledge of the adverse possession, or the possession must be so open and notorious to imply a presumption of that fact. *Kirkman v. Brown*, 93 Tenn. 476, 27 S.W. 709, 710 (Tenn. 1894). When an adverse possessor holds the land for

a period of twenty years, even absent any assurance or color of title, the title vests in that possessor. *Cooke v. Smith*, 721 S.W.2d 251, 255-56 (Tenn. Ct. App. 1986).

Successive possessions, or tacking, may be utilized to establish the requisite period of years if there is no hiatus. *Ferguson*, 190 S.W. at 552; *Catlett v. Whaley*, 731 S.W.2d 544, 545-46 (Tenn. Ct. App. 1987). What is required for tacking is that "the adverse possessor intended to and actually did turn over possession of . . . [the] land." 10 *Thompson on Real Property* § 87.14, at 178; *see also Derryberry v. Ledford*, 506 S.W.2d 152, 156 (Tenn. Ct. App. 1973). . . . .

*Cumulus Broad., Inc.*, 226 S.W.3d at 376-77 (footnote omitted).

The Pruitts cite the following facts in support of their claim of common law adverse possession: (1) Mr. Pruitt paid all the taxes on parcel 24 since 1983 and all the taxes on parcels 26 and 36 since 1992; (2) the Pruitts used some of the money they borrowed in 1999 to tear down the old homeplace on parcel 26 without seeking permission from any family member; (3) in 2006, the Pruitts built a small house on parcel 26 and moved in it temporarily after their home on parcel 24.01 was foreclosed, again without obtaining permission from any family member; (4) the Pruitts later demolished the small house without any permission; (5) Mr. Pruitt conducted his towing business from parcels 24 and 26; (6) parcels 24 and 26 were used for the driveway to access the Pruitts' home on parcel 24.01; and, (7) the Pruitts used parcels 24 and 26 as a yard and playground for their children and grandchildren.

To be sure, the record contains evidence that Mr. Pruitt's extended family believed the land belonged to him. The Pruitts also are correct in that they lived on the property and more or less did as they pleased on it without seeking permission from family members. Crucially, however, the Pruitts never held out that they possessed the property in a manner adverse to the other cotenants. Indeed, Mr. Pruitt testified to having relatively little contact with his family. In our judgment, the facts recited by the Pruitts are insufficient to establish adverse possession by clear and convincing evidence. That their cotenants were unaware of their own interests did not mean they actually lacked interests, or that they were ousted. In fact, the cotenant family members never were ousted; they simply were passive regarding their interests. Their position was, as found by the Trial Court, "more in line with permissive use and not actual ouster between cotenants." We affirm the Trial Court in its declining to find common law adverse possession.

We next address whether the Trial Court erred by denying the Pruitts' claim of champerty. Regarding champerty, this Court has explained:

> Champerty originated in English Common Law; it was designed to prevent the "trafficking of dormant titles." *See* 14 Am.Jur.2d Champerty, Maintenance, Etc. § 12 (2010). Historically, a conveyance of real estate was considered champertous and void if the deed was conveyed when the real property was in the adverse possession of someone other than the grantor. *Id*.

*Foust v. Metcalf*, 338 S.W.3d 457, 462-63 (Tenn. Ct. App. 2010). As provided by statute:

> Any such agreement, bargain, sale, promise, covenant or grant shall be utterly void where the seller has not personally, or by the seller's agent or tenant, or the seller's ancestor, been in actual possession of the lands or tenements, or of the reversion or remainder, or taken the rents or profits for one (1) whole year next before the sale.

Tenn. Code Ann. § 66-4-202 (2015). However, "a finding of adverse possession is a prerequisite to a finding of champerty." *Vincent v. Johnston*, No. E2013-00588-COA-R3-CV, 2014 WL 279682, at *18 (Tenn. Ct. App. Jan. 24, 2014), *no appl. perm. appeal filed*.

As we have discussed, the Pruitts failed to establish adverse possession. The Pruitts' cotenants never were ousted. The Pruitts simply continued to live on the land as they had done before, without ever communicating to the others by word or deed that they were to get, or stay, out. The fact that the cotenants never possessed the land, by itself, does not render the quitclaim deeds champertous. We affirm the Trial Court on this issue, as well.

The final issue we address is whether the Trial Court erred by denying the Pruitts' claim of unclean hands. The Pruitts argue that, even if Mr. Harber obtained some interest in the land, his purpose in filing this suit was spiteful and the Trial Court, as a court of equity, should have applied the unclean hands doctrine to deny him his requested relief. As this Court explained in *In re Estate of Boote*:

> The doctrine of unclean hands is a fundamental tenet of the courts of equity. *Segal v. United Am. Bank*, No. W2004-02347-COA-R3-CV, 2005 WL 3543332, at *4 (Tenn. Ct. App. Dec. 28, 2005) (No Tenn. R. App. P. 11 application filed). It is intended to protect the courts, and it is based on

-18-

the principles that he who seeks equity must do equity and that he who has done inequity cannot have equity. *Tuck v. Payne*, 159 Tenn. 192, 197-98, 17 S.W.2d 8, 9 (1929); *Segelke v. Segelke*, 584 S.W.2d 211, 214 (Tenn. Ct. App. 1978); *Thomas v. Hedges*, 27 Tenn. App. 585, 592, 183 S.W.2d 14, 16 (Tenn. Ct. App. 1944); *See generally* William H. Inman, *Gibson's Suits in Chancery* § 2.09, at 2-9 to 2-11 (8th ed. 2004). When the doctrine applies, it provides the court with a basis to decline to grant relief to parties who have willfully engaged in unconscionable, inequitable, immoral, or illegal acts with regard to the subject matter of their claims. *Hogue v. Kroger Co.*, 213 Tenn. 365, 371, 373 S.W.2d 714, 716 (1962); *C. F. Simmons Med. Co. v. Mansfield Drug Co.*, 93 Tenn. 84, 94, 23 S.W. 165, 168 (1893); *Goodwin v. Hunt*, 11 Tenn. (3 Yer.) 124, 126 (1832); *Prism Partners, L.P. v. Figlio*, 1997 WL 691528, at *6; *Cont'l Bankers Life Ins. Co. of the S., Inc. v. Simmons*, 561 S.W.2d 460, 465 (Tenn. Ct. App. 1977).

*** 

The evidentiary standard when assessing the evidentiary foundation for an argument that the unclean hands doctrine should be applied is the preponderance of the evidence standard. *Town of Bartlett v. Beaty*, 59 Tenn. App. 406, 417-19, 440 S.W.2d 831, 837 (1967); *Estes v. Morris*, 4 Tenn. App. 120, 122 (1926).

***

Decisions regarding the proper application of the doctrine of unclean hands are heavily fact-dependent and are addressed to the considerable discretion of the trial court.

*In re Estate of Boote*, 265 S.W.3d 402, 417-18 (Tenn. Ct. App. 2007) (footnotes omitted).

The Pruitts point out, first, that Mr. Harber is their former attorney. The Pruitts argue that Mr. Harber abused his fiduciary and confidential duties by using information he gleaned from the representation to try to force them off their land. Second, the Pruitts note that by his own testimony, Mr. Harber was angry with the Pruitts. Finally, the Pruitts assert the inequity of Mr. Harber, a well-educated and prosperous man, trying to force the Pruitts, a couple of modest means, off of their family land.

The Pruitts make cogent and compelling arguments about Mr. Harber's spiteful motivations. We are not unsympathetic to the Pruitts' predicament. We also are mindful that Mr. Harber is a former attorney for the Pruitts, making his zeal in pursuing this case

especially unfortunate. Notwithstanding all of this, we disagree with, and find no Tennessee authority to support, the Pruitts' position that bad motivations *alone* are a proper basis for applying the unclean hands doctrine. Parties to lawsuits frequently dislike each other for a host of reasons, or perhaps for no rational reason at all. Often that personal dislike is at least a part of the reason a lawsuit is filed. Courts cannot dismiss lawsuits solely because the plaintiff's dislike of the defendant was a motivating factor in the lawsuit being filed. If the courts did as requested by the Pruitts, parties would have no means of resolving their conflict in court, leaving parties to resolve their conflict by more direct and personal means. The "unclean hands" of the namesake doctrine refer to those unconscionable, inequitable, immoral, or illegal acts—*actions* relating to the litigation, not thoughts. It is, after all, not the "unclean mind" doctrine. The Pruitts make no argument on appeal that the heirs somehow were cheated or duped, or that the Trial Court was misled. The transactions between Mr. Harber and the heirs were freely entered into. There was nothing illegal about the transactions, even if they were highly distasteful. Likewise, we, as did the Trial Court, cannot find the transactions unconscionable, inequitable, or immoral.

At the end of the day, Mr. Pruitt was but one of many heirs with an interest in the subject parcels. The other heirs were at liberty to sell their interests to Mr. Harber if they so wished. They did so. For better or worse, Mr. Harber became a cotenant with the Pruitts. We find no reversible error in the Trial Court's decision to refrain from applying the doctrine of unclean hands and in its ordering the land to be sold. To hold otherwise would leave Mr. Pruitt and Mr. Harber as cotenants in the property, a truly unworkable situation and one that the court-ordered partition is designed to alleviate. We affirm the judgment of the Trial Court.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellants, William M. Pruitt and Shirley J. Pruitt, and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE